# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**SUNDAY DASKALEA**, *et al.*,

    *Plaintiffs,*

    v.

**WASHINGTON HUMANE SOCIETY**, *et al.*,

    *Defendants.*

Civil Action No. 03-02074 (CKK)

## MEMORANDUM OPINION
(August 10, 2011)

Plaintiff Willie A. Jackson ("Jackson") is the sole named representative of a putative class of self-described pet owners in the District of Columbia who contend that their pets were seized, detained, and damaged by Defendants without due process of law. Over the years, the claims asserted in this action have been successively winnowed down through a series of dispositive motions.[1] Following the resolution of those motions, Jackson filed a [87] Renewed Motion for Class Certification ("Motion for Class Certification"), which now comes to this Court on Magistrate Judge Alan Kay's [94] Report and Recommendation, in which Magistrate Judge Kay recommends that the Court deny Jackson's Motion for Class Certification, and on Jackson's [95] Objections to Magistrate Judge Kay's Report and Recommendation ("Objections"). Upon consideration of the parties' submissions, the relevant authorities, and the record as a whole, the Court finds that Jackson's Objections are unfounded and concurs with Magistrate Judge Kay's bottom-line conclusion that Jackson has failed to discharge his burden of showing that

---

[1] Some of those motions were resolved by Judge John Garrett Penn, to whom this action was previously assigned; others were resolved by the undersigned upon reassignment.

certification of the class is appropriate. Accordingly, the Court will overrule Jackson's Objections, adopt Magistrate Judge Kay's Report and Recommendation, and deny Jackson's Motion for Class Certification.

## I. BACKGROUND

The Court assumes familiarity with its prior opinions in this action, which set forth in detail the factual and procedural background of this case. *See Daskalea v. Wa. Humane Soc.*, 480 F. Supp. 2d 16 (D.D.C. 2007) (Penn, J.) ("*Daskalea₁*"); *Daskalea v. Wa. Humane Soc.*, 577 F. Supp. 2d 82 (D.D.C. 2008) (Kollar-Kotelly, J.) ("*Daskalea₂*"); *Daskalea v. Wa. Humane Soc.*, 577 F. Supp. 2d 90 (D.D.C. 2008) (Kollar-Kotelly, J.) ("*Daskalea₃*"); *Daskalea v. Wa. Humane Soc.*, 710 F. Supp. 2d 32 (D.D.C. 2010) (Kollar-Kotelly, J.) ("*Daskalea₄*"). Therefore, the Court will confine its discussion here to setting forth those facts most germane to the pending motion.

### A. *The Remaining Plaintiffs*

Originally, there were three named plaintiffs seeking to represent the putative class in this action—Sunday Daskalea ("Daskalea"), Francis S. Norris, M.D. ("Norris"), and Jackson. *See* First Am. Compl., ECF No. [7], at 1. On June 14, 2010, Plaintiffs' counsel advised the Court that Daskalea and Norris are unable to serve as class representatives as Norris is now deceased and Daskalea has relocated out of the country. *See* Order (June 14, 2011), ECF No. [83], at 1. Since then, Plaintiffs have proceeded with Jackson as the sole representative of the putative class. However, Daskalea has ostensibly maintained her individual claims and remains a member of the putative class. Meanwhile, in part because no formal suggestion of death has been filed with the Court, Norris's individual claims technically remain "live" in this action. *See infra* Part IV.C.

### B.    The Remaining Defendants

The remaining defendants in this action are the District of Columbia and several current and former officers and employees of the Washington Humane Society (the "Humane Society"). The individual defendants include: Jody Huckaby, the former Executive Director of the Humane Society, in her individual capacity; Lisa LaFontaine, in her official capacity as the Humane Society's current President and Chief Executive Officer; Adam Parascandola, the former Director of Law Enforcement for the Humane Society, in his individual capacity; Zita Macinanti, in her official capacity as the Humane Society's current Director of Law Enforcement; Sonya Scnoor, individually and in her official capacity as the Humane Society law enforcement officer who allegedly seized and detained Daskalea's dog; Rosemary Vozobule, individually and in her official capacity as the Humane Society law enforcement officer who allegedly refused to return Daskalea's dog; Lindsay Gardewin, individually and in her official capacity as a Humane Society law enforcement officer who allegedly seized and refused to return Jackson's dog; and H.O. Boozer, individually and in her official capacity as the law enforcement officer who allegedly seized and refused to return Norris's dog (collectively, the "Individual Defendants"). *See* First Am. Compl. ¶¶ 11-16; Order (June 14, 2010) at 1-4.

Originally, Plaintiffs also brought suit against the Humane Society itself and a series of John Doe Defendants. *See* First Am. Compl. ¶¶ 9, 17.  Plaintiffs' claims against the Humane Society were dismissed because the Humane Society is *non sui juris*. *See Daskalea₁*, 480 F. Supp. 2d at 22-24.  Plaintiffs' claims against the John Doe Defendants were dismissed for want of prosecution. *See* Min. Order (Sept. 14, 2010).

In addition, the Court has already concluded that the Individual Defendants are entitled to qualified immunity insofar as they are being sued for constitutional violations in their individual

capacities in connection with their enforcement of the statute at issue in this action as written. *See Daskalea₃*, 577 F. Supp. 2d at 104. The Court has so far declined to hold that the Individual Defendants are entitled to qualified immunity in connection with the actions they are alleged to have taken after seizing Plaintiffs' pets or in connection with Plaintiffs' common law claims for damage to personal property and conversion. *See id.* at 104-05. Resolution of that question will have to await further development of the factual record.

### C. *The Remaining Claims*

Plaintiffs' [7] First Amended Complaint ("Complaint") was filed on March 1, 2004, and it remains the operative iteration of the complaint in this action. It includes a total of eight counts—three constitutional claims and five common law tort claims—each of which challenges, in one way or another, Defendants' administration and enforcement of the District of Columbia's Freedom from Cruelty to Animals Protection Act (the "Act"), D.C. CODE §§ 22-1001-22-1015, in the form that it existed in the time period extending from on or about June 8, 2001, when the District of Columbia's Freedom from Cruelty to Animals Protection Amendment Act of 2000 ("the 2000 Act"), 2000 D.C. Legis. Serv. 13-303 (West), entered into effect, and on or about December 5, 2008, when the District of Columbia's Animal Protection Act of 2008 (the "2008 Amendment"), 2008 D.C. Legis. Serv. 17-281 (West) entered into effect, or March 27, 2009, when its implementing regulations, D.C. MUN. REGS. tit. 24, §§ 1500-1515, were adopted.[2]

During this time period, the operative provision of the Act read as follows:

> (a)     Any person found violating the laws in relation to cruelty to
>           animals may be arrested and held without a warrant . . . .
>           The person making the arrest or the humane officer taking

---

[2] There is some ambiguity as to whether Plaintiffs' challenge is intended to conclude on December 5, 2008, when the 2008 Amendment entered into effect, or March 27, 2009, when the implementing regulations were adopted. For purposes of resolving the pending motion, the ambiguity is immaterial.

possession of an animal shall have a lien on said animals for the expense of such care and provisions.

(b)

(1)     A humane officer of the Washington Humane Society may take possession of any animal to protect it from neglect or cruelty. The person taking possession of the animal or animals, shall use reasonable diligence to give notice thereof to the owner of animals found in the charge or custody of the person arrested, and shall properly care and provide for the animals until the owner shall take charge of the animals; provided that, the owner shall take charge of the animals within 20 days from the date of the notice.

(2)     If the owner or custodian of the animal or animals fails to respond after 20 days, the animal or animals shall become the property of the Washington Humane Society and the Washington Humane Society shall have the authority to:

(A)     Place the animal or animals up for adoption in a suitable home;

(B)     Retain the animal or animals, or

(C)     Humanely destroy the animal or animals.

D.C. CODE § 22-1004 (2002).

Of the eight counts identified in the Complaint, only five, discussed in greater detail below, remain extant in full or in part. Plaintiffs' claims for fraud (Count VI), negligent and intentional infliction of emotional distress (Count VII), and extortion (Count VIII) were dismissed early on in this action for failure to state a claim for relief. *See Daskalea₁*, 480 F. Supp. 2d at 37-39.

As a result, Plaintiffs' five remaining counts are as follows:

- Plaintiffs' Count I, which Plaintiffs label "violation of due process," arises under Section 1 of the Ku Klux Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. §

5

1983 ("Section 1983"). Plaintiffs claim that Defendants (a) deprived them of personal and property interests without due process of law, in violation of the Fifth and Fourteenth Amendments to the Constitution[3] and (b) violated their right to be free from unreasonable searches and seizures, in violation of the Fourth Amendment to the Constitution. *See* First Am. Compl. ¶¶ 71-74.

- Plaintiffs' Count II originally had two components. In the first, Plaintiffs launched a facial challenge to the constitutionality of the Act in the form that it existed prior to the 2008 Amendment. *See id.* ¶¶ 75-77. In the second, Plaintiffs alleged that Defendants had customarily enforced the Act in an unconstitutional fashion—specifically, by failing to provide pet owners with meaningful notice and an opportunity to be heard. *See id.* ¶¶ 75, 78. Of these two components, only the second remains extant. The Court dismissed Plaintiffs Count II insofar as it launched a facial challenge to the constitutionality of the Act on May 2, 2010, concluding that Plaintiffs' facial challenge had been rendered moot by the 2008 Amendment to the Act, which Plaintiffs conceded rectified any facial due process problems.[4] *See Daskalea₄*, 710 F. Supp. 2d at 44-45. As a result, Count II remains "live" only

---

[3] While due process violations are typically analyzed under the Fourteenth Amendment, the District of Columbia—which is not a State—is subject to the Due Process Clause of the Fifth Amendment. *See Butera v. District of Columbia*, 235 F.3d 637, 645 n.7 (D.C. Cir. 2001). To date, no party has moved for dismissal of Plaintiffs' claims under the Fourteenth Amendment on this basis.

[4] In his Motion for Class Certification, Jackson erroneously suggests that his facial challenge under Count II remains extant. *See* Pl.'s Mem. of P. & A. in Supp. of Pl.'s Renewed Mot. for Class Certification ("Pl.'s Certif. Mem."), ECF No. [87], at 7.

insofar as it alleges that Defendants customarily enforced the Act in an unconstitutional manner. In this regard, Count II simply tracks Count I.[5]

- Plaintiffs' Count III is essentially a sub-category of Count I. In Count III, Plaintiffs claim that Defendants, in applying the Act to the named plaintiffs—that is, Daskalea, Norris, and Jackson—"deprived [the named plaintiffs] of property without due process of law, by illegally seizing and detaining their pets, illegally refusing to return the animals to them, failing to provide notice and a meaningful right to be heard, and taking actions which permanently affected their property rights." First Am. Compl. ¶ 80.

- Plaintiffs' Count IV, labeled "destruction of property," alleges that Defendants damaged and destroyed Plaintiffs' pets by sterilizing them, forcing them to undergo surgery, and permanently preventing them from breeding. *See id.* ¶ 81. Previously, the Court construed this count as a claim for "damage to personal property." *Daskalea₁*, 480 F. Supp. 2d at 36.

- Plaintiffs' Count V alleges Defendants committed conversion by seizing Plaintiffs' pets. *See* First Am. Compl. ¶ 84.

Jackson, the sole remaining named representative of the putative class, had his dog seized by the Humane Society. He alleges that on October 11, 2003, members of the Humane Society

---

[5] In the course of summarizing the extended procedural history of this action, Magistrate Judge Kay suggests in a footnote that this Court dismissed Plaintiffs' Count II in its entirety. *See* Report and Recommendation at 2 n.3. That is not strictly accurate. The Court dismissed Plaintiffs' Count II "insofar as it asserts a facial challenge to the constitutionality of the Act." *Daskalea₄*, 710 F. Supp. 2d at 45. The Court left the claim intact insofar as it challenges the way in which the Act had been "customarily enforced." First Am. Compl. ¶ 75. However, because this aspect of Plaintiffs' Count II is essentially duplicative of Plaintiffs' remaining claims, which were the focus of Magistrate Judge Kay's Report and Recommendation, this minor inaccuracy had no impact on the actual substance of Magistrate Judge Kay's Report and Recommendation.

"entered [his] family['s] home and illegally seized [his dog]," a female Rottweiler that had

"developed terminal cancer," through a series of "threats and false statements." *Id.* ¶¶ 59, 61.

"[D]espite numerous demands" to free the animal, the Humane Society "refused to return [his

dog]" until Jackson would "consent to, and pay for . . . major cancer surgery," even though his

veterinarian advised against such treatment. *Id.* ¶¶ 61, 64. In an attempt to appease the Humane

Society, Jackson provided his pet's veterinary records "for the prior four years, [which]

document[ed the animal's] exemplary medical treatment." *Id.* ¶ 61. The Humane Society was

not satisfied, however, and demanded that the animal undergo "radical treatment." *Id.* ¶ 64.

"[U]nder compulsion from the Humane Society, [] Jackson was compelled to agree to the cancer

surgery." *Id.* ¶ 65. The treatment was unsuccessful and the animal died. *Id.* ¶ 64. At no time

during this process was Jackson given an opportunity to contest the seizure and terms of the

release of his pet, including the reasonableness of the cancer treatment. *Id.* ¶ 70.

In addition to recounting the alleged events leading to the seizure of Jackson's pet, the

Complaint includes allegations concerning Daskalea and Norris. Although Daskalea and Norris

no longer seek to serve as representatives of the putative class, *see supra* Part I.A, the allegations

in the Complaint specifically pertaining to them are useful in fleshing out the composition of the

proposed class.

On May 17, 2002, Daskalea left her dog unattended in her vehicle while "she went up to

her apartment to get some things." First Am. Compl. ¶¶ 31, 33. The dog, "a full-bred, pedigreed

'Dogo Argentino,'" which she had purchased "for breeding, as well as companionship"

purposes, "had just been walked, watered and fed, and was in absolutely no danger." *Id.* ¶ 31. It

is not clear from the Complaint how long the animal was left unattended; however, while

Daskalea was in her apartment, Defendant Sonya Scnoor, a Humane Society law enforcement

officer, seized the dog from the car. *Id.* ¶ 36. Daskalea's "[r]epeated efforts . . . to retrieve [her dog] . . . were unsuccessful," and the Humane Society "refused to return" the animal. *Id.* ¶ 39. While in the custody of the Humane Society, the dog was "forcibly sterilized." *Id.* ¶ 41. Although the animal was eventually returned, it was "permanently prevented from breeding" and its "personality ha[d] changed." *Id.* ¶¶ 43, 45.

On July 19, 2002, Norris left her dog, a Schipperke lap dog, unattended in her car while she "went to [a] nearby sports club." *Id.* ¶ 46. Norris "parked her car under a large shade tree . . . cracked all four car windows, [and] left food and water for [the animal]." *Id.* Upon returning to her car, "Norris found that officer H.O. Boozer . . . of the Humane Society had entered her car and seized [her dog] without her permission, knowledge or consent." *Id.* ¶ 48. Norris maintains that her dog "was perfectly fine and in absolutely no danger" at the time of the seizure. *Id.* ¶ 49. Her "[e]fforts . . . to retrieve [her dog] . . . were [initially] unsuccessful." *Id.* ¶ 54. The Humane Society eventually "agreed to return [the dog], but only if [] Norris agreed to pay . . . [for] unnecessary medical treatment." *Id.* ¶ 55. Norris "reluctantly agreed" to the treatment, realizing it was the "only way" the Humane Society would return her pet. *Id.* The dog was "bedraggled" and "in terrible condition" when released. *Id.* ¶ 56.

### D. *Pre-Certification Discovery*

On June 14, 2010, the Court granted Plaintiffs leave to conduct limited pre-certification discovery. *See* Order (June 14, 2010) at 3-4. Specifically, the Court concluded that Plaintiffs were entitled to receive three categories of documents in connection with each impoundment that occurred during the putative class period: (1) the official notice of violation; (2) the police report; and (3) the computerized docket sheet. *See id.* As part of the discovery allowed, counsel for the Individual Defendants produced extensive computer records identifying those individuals whose

pets were seized during the putative class period and who met the definition of the proposed class, and also made individual paper files available to Plaintiffs for inspection. *See* Ltr. From H. Hamilton, Esq. to P. Zukerberg, Esq. (Aug. 20, 2010), ECF No. [91-1], at 1. According to the record, it appears that Jackson's counsel received and reviewed at least twenty-three boxes of records, and attempted to conduct an informal survey of the impoundments documented by those records. *See* Ltr. From P. Zuckerberg, Esq. to H. Hamilton, Esq. (Aug. 30, 2010), ECF No. [91-1], at 1-2.

### E.    *Jackson's Motion for Class Certification*

On October 7, 2010, Jackson filed the pending Motion for Class Certification.[6] *See* Pl.'s Certif. Mem. The District of Columbia and the Individual Defendants filed separate oppositions. *See* District of Columbia's Mem. of P. & A. in Opp'n to Pl.'s Mot. for Class Certification, ECF No. [90]; Individual Defs.' Opp'n to Pl.'s Mot. for Class Certification ("Indiv. Defs.' Certif. Opp'n"), ECF No. [89]. Jackson filed a consolidated reply. *See* Pl.'s Reply Mem. in Supp. of Class Certification ("Pl.'s Certif. Reply"), ECF No. [91].

In his Motion for Class Certification, Jackson seeks to serve as the sole representative for a class comprised of "[a]ll persons whose pets were seized in the District of Columbia by the defendants" during the period that the 2000 Act "was the operative law"—that is, until the date the 2008 Amendment and its implementing regulations entered into effect. Pl.'s Certif. Mem. at 4. Based on records produced during the course of pre-certification discovery, Jackson estimates that there are between 3,000 and 6,000 members in the putative class. *See id.* at 11-12.

---

[6] The Court held a previous [19] Motion for Class Certification in abeyance pending resolution of various dispositive motions. *See* Scheduling and Procedures Order, ECF No. [49], at 4-5. The pending Motion for Class Certification supersedes that motion.

Jackson seeks certification of the putative class under Rule 23(b)(1) or (b)(3) of the

Federal Rules of Civil Procedure, though he indicates that his preference is for certification

under subdivision (b)(1) so that he might "avoid[] the often burdensome and costly notice

requirements applicable to (b)(3) classes." *Id.* at 3.

### F. *Magistrate Judge Kay's Report and Recommendation*

This Court referred Jackson's Motion for Class Certification to Magistrate Judge Kay for

purposes of preparing a report and recommendation under Local Civil Rule 72.3(a). *See* Order

Referring Case to Magistrate Judge (Dec. 6, 2010), ECF No. [92]. On February 15, 2011,

Magistrate Judge Kay held a hearing and heard argument concerning Jackson's Motion for Class

Certification. *See* Min. Entry (Feb. 15, 2011).

On May 26, 2011, Magistrate Judge Kay issued his written Report and Recommendation.

Therein, Magistrate Judge Kay addresses whether Jackson has (a) satisfied each of the four

prerequisites for class certification under Rule 23(a) and (b) established whether certification is

appropriate under one of the subdivisions of Rule 23(b). *See infra* Part II.B (describing the legal

standard for class certification). With respect to the prerequisites for class certification,

Magistrate Judge Kay concluded that Jackson had carried his burden with respect to three of the

four prerequisites—namely, numerosity, commonality, and adequacy of representation. *See*

Report and Recommendation at 6-12, 15-16. More specifically, he found that Jackson's estimate

that the purported class consists of between 3,000 and 6,000 members was supported by

documentary evidence showing the number of pets seized during the class period and satisfied

the legal standard for numerosity, *see id.* at 6-7; that the question of whether Plaintiffs can

demonstrate that the Act, as applied, resulted in a violation of their constitutional right to due

process provided a sufficient basis for the satisfaction of commonality, *see id.* at 7-12; and that

11

putative class counsel's qualifications and experience and his past record of representation in this action were sufficient to satisfy the adequacy of representation requirement, *see id.* at 15-16. However, Magistrate Judge Kay determined that Jackson failed to show that he satisfies the typicality requirement of Rule 23(a). *See id.* at 12-15. In addition, Magistrate Judge Kay found that Jackson had failed to show that certification is appropriate under any of the relied-upon subdivisions of Rule 23(b)—namely, subdivisions (b)(1) and (b)(3). *See id.* at 16-25.

### G. Jackson's Objections to the Report and Recommendation

On June 13, 2011, Jackson filed his Objections to Magistrate Judge Kay's Report and Recommendation. On June 30, 2011, the District of Columbia and the Individual Defendants filed separate responses to Jackson's Objections. *See* District of Columbia's Resp. to Pl.'s Objections, ECF No. [97]; Individual Defs.' Opp'n to Pl.'s Objections, ECF No. [96]. Jackson did not file a timely reply.

Unsurprisingly, Jackson's Objections are limited to those parts of Magistrate Judge Kay's Report and Recommendation adverse to him. Specifically, Jackson contends that Magistrate Judge Kay erred by concluding that Jackson failed to establish that he satisfies the typicality requirement of Rule 23(a) and that certification is appropriate under Rule 23(b)(1) or (b)(3). *See* Pl.'s Objections at 2. In this regard, Jackson's arguments by and large rehash the arguments he made before Magistrate Judge Kay in the course of briefing the Motion for Class Certification.

## II. LEGAL STANDARDS

### A. Review of a Magistrate Judge's Report and Recommendation

This Court referred Jackson's Motion for Class Certification to Magistrate Judge Kay for purposes of preparing a report and recommendation under Local Civil Rule 72.3(a). *See* Order Referring Case to Magistrate Judge (Dec. 6, 2010). "Any party may file . . . written objections to

12

the magistrate judge's proposed findings and recommendations," and must "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for the objection." LCvR 72.3(b). Upon the filing of objections, the "district judge [must] make a *de novo* determination of those portions of a magistrate judge's findings and recommendations to which objection is made," and may do so "based solely on the record developed before the magistrate judge, or may conduct a new hearing, receive further evidence, and recall witnesses." LCvR 72.3(c). The "district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the magistrate judge, or may recommit the matter to the magistrate judge with instructions." *Id.*

### B.    *Motions for Class Certification*

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure. There are two components to the certification inquiry under Rule 23. First, each of the four elements of Rule 23(a) must be met. *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006). That is, the proponent of certification must establish: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a). These four requirements are commonly referred to in shorthand as numerosity, commonality, typicality, and adequacy of representation, respectively. Second, certification of the proposed class must be appropriate under at least one of the three categories enumerated in Rule 23(b). In this case, Jackson relies upon subdivisions (b)(1) and (b)(3), which requirements are discussed in greater detail elsewhere. *See infra* Part IV.B.

The proponent of the class bears the burden of proof. *Harris v. Koenig*, 271 F.R.D. 383, 388 (D.D.C. 2010) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). The Supreme Court has stated that "Rule 23 does not set forth a mere pleading standard"; rather, "[a] party seeking class certification must affirmatively demonstrate [its] compliance with the Rule—that is, [it] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S. Ct. 2541, 2551 (2011) (emphasis in original).[7] At times, determining whether the proponent has met its burden will require the district court to "probe behind the pleadings" and address matters that are enmeshed with the factual and legal issues relevant to the merits of the plaintiffs' causes of action. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). At the same time, the district court should "refrain from making determinations on the merits that are unnecessary to resolving the class certification question." *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 323 n.6 (D.D.C. 2011). Ultimately, the district court's determination must rest on a "rigorous analysis" to ensure that all the requirements are satisfied, and "[a]ctual, not presumed, conformance" with Rule 23 is indispensable. *Falcon*, 457 U.S. at 160-61.

Because district courts are "uniquely well situated to make class certification decisions," *McCarthy v. Kleindienst*, 741 F.2d 1406, 1410 (D.C. Cir. 1984) (citing *Burns v. U.S. R.R. Ret. Bd.*, 701 F.2d 189, 191 (D.C. Cir. 1983)), they exercise "broad discretion in deciding whether to permit a case to proceed as a class action," *Hartman v. Duffey*, 19 F.3d 1459, 1471 (D.C. Cir. 1994) (citing *Bermudez v. U.S. Dep't of Agric.*, 490 F.2d 718, 725 (D.C. Cir.), *cert denied*, 414 U.S. 1104 (1973)). Provided the district court "'applies the correct criteria to the facts of the

---

[7] The Court notes that when Magistrate Judge Kay issued his Report and Recommendation on May 26, 2011, he did not have the benefit of the Supreme Court's decision in *Dukes*, which was issued on June 20, 2011.

case, the decision should be considered to be within [its] discretion.'" *Bermudez*, 490 F.2d at 725 (internal quotation marks omitted; citation omitted).

## III. PRELIMINARY MATTERS

Before reaching the merits of Jackson's Objections to Magistrate Judge Kay's Report and Recommendation, the Court pauses to make two overarching observations about the nature of Jackson's Motion for Class Certification.

First, despite having been afforded the opportunity to conduct limited pre-certification discovery, *see supra* Part I.D, Jackson's Motion for Class Certification offers no meaningful factual elaboration of the class beyond providing a rough estimate of the overall size of the class. Instead, Jackson has elected to rest almost exclusively on the factual allegations set forth in the Complaint, a document which was filed long before this Court authorized the parties to engage in pre-certification discovery and resolved various dispositive motions, narrowing the claims at issue in this action and articulating the legal principles applicable to Plaintiffs' extant claims.[8] Notably, even though the Court granted Jackson leave to conduct pre-certification discovery to obtain the official notice of violation, the police report, and the computerized docket sheet for each impoundment occurring during the putative class period—and the record suggests that Defendants produced a substantial volume of records responsive to Plaintiffs' requests—Jackson does not append this material to his Motion for Class Certification nor attempt to summarize or distill the information gleaned during pre-certification discovery in an attempt to illuminate for the Court the composition of the putative class and the overall propriety of allowing this case to

---

[8] In connection with his Motion for Class Certification, Jackson has submitted (a) a declaration outlining the qualifications of his counsel, (b) correspondence between the parties concerning pre-certification discovery, (c) pleadings relating to Jackson's attempts to secure injunctive relief before the Superior Court of the District of Columbia, and (d) limited documentation allegedly evidencing some, but not all, of the damages suffered by the named plaintiffs. *See* Pl.'s Certif. Reply Exs. 1-8.

proceed as a class action. Of course, this is not necessarily fatal to Jackson's Motion for Class

Certification. To the extent Jackson is still able to satisfy this Court, after a rigorous analysis,

that the requirements of Rule 23 are in fact satisfied in this case based upon the allegations set

forth in the Complaint and the arguments of his counsel, then he may secure leave to represent

the putative class. *See Dukes*, 131 S. Ct. at 2551. The Court merely notes that, as the proponent

of the class, the burden ultimately lies with Jackson.

Second, as set forth in greater detail above, five of the eight counts identified in the

Complaint remain extant in full or in part. *See supra* Part I.C. Some of those claims are

challenges to the constitutionality of the Act as administered and enforced by Defendants, while

others are common law claims sounding in conversion and damage to personal property. *See id.*

In the course of reciting the procedural history of this case, Jackson mentions these five extant

claims in passing. *See* Pl.'s Certif. Mem. at 6-7. Thereafter, in arguing in favor of class

certification, Jackson focuses his attention exclusively on Plaintiffs' claim under Section 1983, a

claim that Defendants deprived members of the putative class of personal and property interests

without due process of law in violation of the Fifth and Fourteenth Amendments to the

Constitution and violated their right to be free from unreasonable searches and seizures in

violation of the Fourth Amendment to the Constitution. Consistent with this focus, when

Jackson speaks of commonality in the proposed class, he consistently refers to the

"constitutionality of defendants' due process procedures for seizing and adjudicating the status of

seized pets," Pl.'s Certif. Mem. at 13, the "lack of due process prior to the ultimate decision on

the pet's fate," Pl.'s Certif. Reply at 5, the "deprivation of constitutional rights," Pl.'s Objections

at 12, and the like. By contrast, Jackson makes no substantive mention—none—of Plaintiffs'

common law claims for conversion and damage to personal property. This omission is

particularly troubling because the Individual Defendants argue at considerable length in their opposition that certification of the proposed class with respect to Plaintiffs' common law claims is inappropriate, *see* Indiv. Defs.' Certif. Opp'n at 4-5, 16-17, an argument to which Jackson offers no rejoinder whatsoever in his reply (or, for that matter, in his Objections to Magistrate Judge Kay's Report and Recommendation).[9] Presented with this record, the Court simply has no basis for concluding that the certification of the putative class is appropriate with respect to Plaintiffs' common law claims. At a bare minimum, Jackson has failed to carry his burden of satisfying this Court that the requirements of Rule 23 are in fact satisfied in this case with respect to Plaintiffs' common law claims. *See Dukes*, 131 S. Ct. at 2551. Accordingly, the Court will deny Jackson's Motion for Class Certification insofar as it seeks certification of the putative class in connection with these claims.

## IV. DISCUSSION

The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). In order to justify a departure from that rule, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'" *E. Tex.*

---

[9] While the Court declines to reach the question in the absence of *any* argument from Jackson, the Court pauses to observe that the Individual Defendants' arguments as to why certification of the class with respect to Plaintiffs' common law claims is inappropriate appear at first glance to be compelling. *See* Indiv. Defs.' Certif. Opp'n at 16-17. Briefly stated, there is reason to believe that establishing liability for conversion would require the fact-finder to look at each impoundment individually to determine whether the owner suffered a sufficiently substantial deprivation of his or her property interests to rise to the level of conversion and whether Defendants were in wrongful possession of the animal based upon the totality of the circumstances surrounding the seizure. Similarly, there is reason to believe that establishing liability for damage to personal property would require the fact-finder to look at each injury and make individual determinations as to whether Defendants breached a duty to a class member and caused a cognizable injury. Against these arguments, Jackson has offered nothing that would suggest that these claims are readily amenable to class-wide resolution.

*Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). In this case, Jackson seeks to serve as the sole representative for a class comprised of "[a]ll persons whose pets were seized in the District of Columbia by the defendants" during the period that the 2000 Act "was the operative law"—that is, until the date the 2008 Amendment and its implementing regulations entered into effect. Pl.'s Certif. Mem. at 4. He seeks certification of the putative class under Rule 23(b)(1) or (b)(3). *Id.* at 3. For the reasons set forth below, the Court concurs with and adopts Magistrate Judge Kay's bottom-line conclusion that Jackson has failed to discharge his burden of showing that certification of the class is appropriate. Accordingly, the Court will overrule Jackson's Objections, adopt Magistrate Judge Kay's Report and Recommendation, and deny Jackson's Motion for Class Certification.

### A.    *Jackson Has Failed to Show that He Satisfies the "Typicality" Requirement Under Rule 23(a)(3)*

Rule 23(a) and its typicality requirement "ensure[] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Dukes*, 131 S. Ct. at 2550. Generally speaking, "[t]ypicality is . . . satisfied when the plaintiffs' claims arise from the same course of conduct, series or events, or legal theories of other class members." *In re XM Satellite Radio Holdings Secs. Litig.*, 237 F.R.D. 13, 18 (D.D.C. 2006) (citations omitted). "The facts and claims of each class member do not have to be identical to support a finding of typicality; rather, typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 52 (D.D.C. 2010) (internal quotation marks and notations omitted; citation omitted). At bottom, the typicality requirement is used to ascertain "whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of the absent class

members so as to assure that the absentees' interests will be fairly represented." *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 27 (D.D.C 2001) (citations omitted).

It has frequently been observed that "[t]he commonality and typicality requirements . . . tend to merge," with "[b]oth serving as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157-58 n.13. That sensible observation is particularly apt in this case. Here, the members of the proposed class suffered a wide range of deprivations, were provided with different kinds of notice at different points in time, and claim distinct injuries. These differences are of constitutional significance and, as such, implicate class members' very ability to prevail on their claims. Simply put, Jackson's claims are not typical of all or even most of the different claims that comprise the class. Indeed, the Court doubts that any single named plaintiff could serve as the representative for the entirety of the broad class proposed.[10]

The Court begins with an important observation about the limitations of Jackson's Motion for Class Certification in this respect. Jackson identifies the putative common question uniting the class in the following manner:

> [T]he common issue is whether the various Defendants, in enforcing the prior Act, deprived Plaintiffs of "personal and property interests without due process of law, in violation of the Fifth and Fourteenth Amendments to the Constitution," as well as their right to be free from unreasonable searches and seizures pursuant to the Fourth Amendment to the Constitution.

---

[10] Originally, there were three named plaintiffs seeking to represent the class—Daskalea, Norris, and Jackson; Plaintiffs now attempt to proceed with Jackson as the sole representative of the putative class. *See supra* Part I.A.

Pl.'s Certif. Mem. at 13.[11]  However, at no point in his submissions does Jackson explain *how* the

Plaintiffs would go about proving this question in the context of a class action.  Indeed,

completely absent from Jackson's submissions is any meaningful description of the basic legal

principles governing Plaintiffs' extant claims.  This omission is both inexplicable and

unacceptable.  It is Jackson's burden to establish that class members' claims "depend upon a

common contention" and that the common contention is "of such a nature that it is capable of

*classwide resolution*—which means that determination of its truth or falsity will resolve an issue

that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551

(emphasis added).  By tendering only generalities and no meaningful legal analysis, Jackson has

failed to discharge his burden; his attempts to shift that burden to Defendants and this Court are

patently impermissible.

It may be that that Jackson's failure to address the legal framework governing his

proffered common question was intentional since, once one takes a close look at that framework,

it becomes clear that Jackson's claims are not typical of claims that are capable of class-wide

resolution.  Critical to this conclusion is the fact that this Court has already rejected Plaintiffs'

facial challenge to the constitutionality of the Act, leaving only Plaintiffs' as-applied

constitutional challenge, *see Daskalea$_4$*, 710 F. Supp. 2d at 41-42, something that Jackson

mentions but does not appear to appreciate.  Instead, as he has consistently in this action, Jackson

continues to conflate Plaintiffs' facial and as-applied challenges. *See, e.g.*, Pl.'s Certif. Mem. at

14 ("The due process defects complained of were suffered by all class members, because the

former Act suffers from the same procedural flaw: the failure to provide pet owners with notice

---

[11]  Despite Jackson's passing references to "unreasonable searches and seizures," he never
attempts to distinguish that theory of liability from his contention that Defendants denied the
class due process, which is the only contention that receives any meaningful measure of attention
in Jackson's submissions.

and an opportunity to be heard."). The Court has previously warned Jackson to avoid the conflation of these theories:

> Plaintiffs appear to be under the misguided belief that a holding by this Court that the Act is unconstitutional as previously written would, in effect, serve as a litigation "short-cut." * * * In other words, Plaintiffs contend that a finding in their favor as to the facial unconstitutionality of the Act would permit them to proceed directly to the damages stage, thereby avoiding litigation of their as-applied claim. Under this theory, Plaintiffs would be entitled to monetary damages for injuries caused by the enforcement of the Act without being required to first prove the merits of their as-applied claim, the litigation of which—unlike their facial challenge—would require the time and expense of discovery. Such an argument is patently incorrect. To the extent Plaintiffs seek compensatory damages for individual injuries allegedly sustained by application of the Act, they must proceed with litigation of their as-applied challenges.

*Daskalea*₄, 710 F. Supp. 2d at 45. Despite this admonition, Jackson never explains how Plaintiffs would "proceed with litigation of their as-applied challenges" within a class action. *Id.*

Plaintiffs' constitutional claims are predicated upon alleged violations of the Due Process Clause, which provides that "[n]o personal shall . . . be deprived of life, liberty, or property, without due process of law." There are three basic elements to a procedural due process claim: there must be (1) a deprivation; (2) of life, liberty, or property; (3) without due process of law. *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991). It has long been established that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). However, it is equally fundamental that due process is "not a technical conception with a fixed conception unrelated to time, place and circumstances"; rather, it is "flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334.

Consistent with these principles, "[t]he precise form of notice and the precise kind of hearing required [in a given circumstance] depend[] upon a balancing of the competing public and private interests involved." *Propert*, 948 F.2d at 1332.[12] In determining what process is due, three distinct factors are considered—commonly referred to as the "*Mathews* factors," a reference to the Supreme Court decision in which they were first articulated:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. "Depending on the tilt of the *Mathews* balance in a particular case, the usual requirement of written notice may be relaxed, and the timing and content of the hearing may vary." *Propert*, 948 F.2d at 1332 (internal citation omitted); *see also United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (whether a post-deprivation hearing will suffice "requires an examination of the competing interests at stake, along with the promptness and adequacy of later proceedings."). Given the intensely fact-based nature of the inquiry, the Supreme Court has chastised courts that have adopted a "sweeping and categorical" approach to due process. *Gilbert v. Homar*, 520 U.S. 924, 931 (1997).[13]

---

[12] In his submissions, Jackson relies heavily upon the United States Court of Appeals for the District of Columbia Circuit's decision in *Propert*, but that case was a single-plaintiff case and did not involve a class action. Moreover, the defendant in that case conceded that its policy was to provide no pre- or post-deprivation hearing of any kind, and it was that concession that the Court of Appeals found "fatal" to the policy's constitutional validity. *Propert*, 948 F.2d at 1333.

[13] The Court notes that its conclusions here also hold true for Plaintiffs' constitutional claims to the extent they are based on allegations that Defendants violated the prohibition against unreasonable searches and seizures under the Fourth Amendment to the Constitution, a component of Plaintiffs' claim that is recited, but otherwise ignored, in Jackson's submissions. Even assuming the applicability of that prohibition in this case, determining the reasonableness of a particular search or seizure demands "a careful balancing of the nature and quality of the

In his Motion for Certification, Jackson does not even argue in favor of a "one-size-fits-all" or "across-the-board" approach that could be applied in this case. Even if he had, the Court agrees with Magistrate Judge Kay that such an approach would be unworkable. *See* Report and Recommendation at 20 (concluding that "liability determinations will be based on individual circumstances"). As the Court has previously had the occasion to observe, the operative iteration of the Act during the putative class period conferred "considerable discretion" upon the Humane Society and its employees. *Daskalea₁*, 480 F. Supp. 2d at 33. Once an animal had been deemed to be neglected, the statute only required the Humane Society to use "'reasonable diligence to give notice'" to the animal's owner, but did not specify the form or timing of the notice. *Id.* (quoting D.C. CODE § 22-1004(b)(1) (2002)); *see also Daskalea₂*, 577 F. Supp. 2d at 87-88. Similarly, the Act left it to the Humane Society to determine the post-seizure actions that it would apply in a given case: among other things, it could return the animal to the owner, retain the animal, place the animal up for adoption, or humanely destroy the animal. *See* D.C. CODE § 22-1004 (2002). And the Act did not attempt to define how the Humane Society might choose among these options. In short, the Act was sufficiently open-ended that the Humane Society's enforcement and administration of the Act were largely left to its discretion, and it therefore comes as no surprise that there would be considerable variation among class members' experiences. *Cf. Dukes*, 131 S. Ct. at 2554 (faulting plaintiffs for failing to identify "a common mode of exercising discretion"). Indeed, members of the proposed class allegedly suffered a

---

intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted; citations omitted). It is well-established that "[t]his balancing test is . . . fact-intensive; it looks to the totality of the circumstances . . . at the time of the challenged conduct." *Martin v. Malhoyt*, 830 F.2d 237, 261 (D.C. Cir. 1987).

wide range of deprivations, were provided with different kinds of notice at different points in time, and claim distinct injuries.

Of these differences, perhaps most important is that the putative class members are alleged to have suffered a wide range of deprivations: some pets were temporarily detained, others were permanently destroyed, and still others were forcibly sterilized or returned to their owners only after requiring the payment of fees and expenses or unwanted medical treatment. *See* First Am. Compl. ¶ 71. This is far from a trivial point; it goes to the very heart of Plaintiffs' claims. This is because the due process inquiry turns in part on "the private interest . . . affected by the official action," *Mathews*, 424 U.S. at 335, and "[t]he magnitude of [the] deprivation is of critical significance in the due process calculus," *Lassiter v. Dep't of Soc. Servs. of Durham Cnty.*, 452 U.S. 18, 40 (1981) (Burger, J., dissenting) (citing *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970)). Indeed, this Court has previously had the opportunity to explain why the magnitude of the deprivation may be significant in this case, observing that Defendants "must provide an owner notice and an opportunity for a hearing prior to *permanently* terminating an individual's interest in a seized animal," *Daskalea₁*, 480 F. Supp. 2d at 34 (emphasis added), but cautioning that "animal cruelty or neglect will often justify [an] immediate seizure" *temporarily* terminating an individual's interest in a seized animal even in the absence of a pre-deprivation opportunity to be heard, *id.* at 35; *see also Propert*, 948 F.2d at 1332 ("[A]lthough the provision of procedural safeguards sometimes may be postponed, such safeguards must be provided prior to the time that a deprivation becomes final.") (citation omitted). In more concrete terms, an owner whose pet was humanely destroyed or put up for adoption will not be similarly situated to an owner whose pet was merely detained and returned to its owner. *See Wall v. City of Brookfield*, 406 F.3d 458, 460 (7th Cir. 2005) (Posner, J.) (concluding that the "temporary deprivation" of a dog requires

only "modest process"). At bottom, the process that was constitutionally due will necessarily vary depending upon the nature and magnitude of the deprivation at issue.[14]

Similarly, the process required will vary depending upon the strength of the Defendants' interest in a given case. *See Mathews*, 424 U.S. at 335. In this regard, the exigency of the circumstances that lead to a particular seizure will affect the nature of the procedures required. Simply by way of example, assume that Defendants provided Daskalea and Norris the same notice and opportunity to be heard. Both Daskalea and Norris had their pets seized from their automobiles while they were at another location. *See* First Am. Compl. ¶¶ 31, 46. However, whereas it is alleged that Norris "parked her car under a large shaded tree . . . [,] cracked all four car windows, [and] left food and water," *id.* ¶ 46, no comparable allegations appear with respect

---

[14] Indeed, the Court need look no further than the three named plaintiffs to conclude that there is considerable variation among the deprivations allegedly suffered. Daskalea's pet, which was purchased in part for breeding, was temporarily detained and "forcibly sterilized" while in Defendants' custody; Norris's dog was temporarily detained and released upon Norris's agreement to pay certain fees and ensure that her dog got "unnecessary medical treatment"; and Jackson's dog was temporarily detained and returned only after he agreed to get his dog "radical treatment" that led to the dog's death. First Am. Compl. ¶¶ 34, 41, 55, 64. As proposed, the deprivations within the putative class would sweep even more broadly: inevitably, some class members will have had their dogs returned to them only after paying for "the expense of . . . care and provisions," D.C. CODE § 22-1004(a) (2002), others will have had their dogs "place[d] . . . up for adoption in a suitable home," *id.* § 22-1004(b)(2)(A); still others will have their dogs "humanely destroy[ed]" and permanently lost, *id.* § 22-1004(b)(2)(C). Within these categories, there will be yet more variation, potentially constitutionally significant variation. For instance, for those dogs subjected to forced sterilization, it is arguably relevant whether the dog was purchased or suitable for breeding, such as Daskalea's, or merely a household pet, such as Jackson's. For those dogs that were temporarily detained but not destroyed, the length of the detention will inevitably vary. *See Mathews*, 424 U.S. at 341 ("[T]he possible length of wrongful deprivation of benefits . . . is an important factor in assessing the impact of official action on the private interests."). In other words, the alleged deprivations, and by extension the process that was constitutionally required, will differ considerably from case to case. Furthermore, although the Court need not reach the issue, the Court notes that there is some authority from other jurisdictions suggesting that a temporary dispossession of personal property may, in some circumstances, not even rise to the level of an actionable deprivation. *See, e.g., Gall v. City of Vidor*, 903 F. Supp. 1062, 1066 (E.D. Tex. 1995); *Kostiuk v. Town of Riverhead*, 570 F. Supp. 603, 608 (E.D.N.Y. 1983)

to Daskalea. All other things being equal, it is at least arguable that Defendants' interest in seizing Daskalea's dog would be stronger than their interest in seizing Norris's dog. While this may seem particularized, the Due Process Clause is fact-specific and only "calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334.

Likewise, there are important variations within the class not just as to the process that may have been constitutionally due, but also as to the process that was actually provided. In this regard, Jackson has never suggested that the form and the timing of the notice and the opportunity to be heard provided to class members were consistent or even similar across the class. Indeed, the Court need look no further than the differences among the three named plaintiffs to conclude that this was not the case. According to the Complaint, Jackson was present at the time his pet was seized by the Humane Society, meaning that he was given contemporaneous, if not prior, notice of the deprivation. *See* First Am. Compl. ¶ 61. In contrast, Daskalea and Norris, and certainly other class members, had their pets seized while they were in another location. *Id.* ¶¶ 36, 48. More broadly, given the open-endedness of the Act, and the discretion afforded the Humane Society's law enforcement officers, there is no doubt that the process actually afforded to class members varied, which for obvious reasons has a central bearing on the validity of Plaintiffs' claims that they were denied due process.[15] *See Lightfoot*, 273 F.R.D. at 331 ("[T]here is no definitive notice period supplied by *Mathews* or its progeny.") (citation omitted).

---

[15] Nor is it likely that the Defendants' ability to provide notice was consistent from case to case. Unlike the towing of automobiles at issue in *Propert*, where the owner's identity could be easily ascertained by licensing and registrations records, *see Propert*, 948 F.2d at 1334, class members' pets may have been seized while in an owner's vehicle or home, in a stranger's vehicle or home, or stray in the streets; some pets may have been tagged, others may not have been identified.

Collectively, these considerations illustrate how Plaintiffs' as-applied challenges to Defendants' administration and enforcement of the Act are not amenable to resolution on a class-wide basis. Despite Jackson's mantra that "the prior Act fails to provide due process to pet owners," Pl.'s Certif. Reply at 5, this Court agrees with Magistrate Judge Kay that "liability determinations will be based on individual circumstances," Report and Recommendation at 20. Simply put, Jackson has framed his claims and the class claims with such a level of generality and abstraction as to render them essentially meaningless. Indeed, his "allegations reduce to an empty invocation of the legal standard governing procedural due process claims generally." *Lightfoot*, 273 F.R.D. at 325. From this perspective, Jackson's proffered "common question" is a perfect illustration of the United States Court of Appeals for the District of Columbia Circuit's sensible observation that, "'at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.'" *Love v. Johanns*, 439 F.3d 723, 729-30 (D.C. Cir. 2006) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)). If the Court were to accept such a formulation, it would effectively be forced into the uncomfortable position of relying upon the "sweeping and categorical" approach to due process rejected by the Supreme Court. *Gilbert*, 520 U.S. at 931.

Instructive in this regard is the United States District Court for the Northern District of Illinois's decision in *Jones v. Takaki*, 153 F.R.D. 609 (N.D. Ill. 1993). There, the court found that typicality was lacking where the plaintiffs "asserted a course of conduct and practice . . . of not affording persons whose property ha[d] been seized illegally with a prompt post-deprivation hearing." *Id.* at 611. Ultimately, the court concluded that the "alleged practice [was] insufficient to meet the typicality requirement," reasoning that "[w]hether a delay in instituting [hearing] proceedings violate[d] due process entail[ed] a fact specific inquiry to be made on a case by case

basis," with reference to such factors as the length of the delay, the reason assigned for the delay, whether the plaintiff asserted a right to a hearing, and the prejudice to the plaintiff. *Id.* at 611. Because the putative class representatives could not establish "the bulk of the elements of each class member's claim in the process of proving their own, they . . . failed to meet the typicality requirement." *Id.* at 612.

Those observations apply with no less force here. In the final analysis, Jackson has failed to supply a basis that would allow this Court to conclude that his claims are typical of claims that are amenable to resolution on a class-wide basis. There is no reason to believe that this action can be efficiently maintained as a class or that Jackson's interests sufficiently align with those of the class. *See Lorazepam*, 202 F.R.D. at 27 (D.D.C 2001). Accordingly, the Court will deny Jackson's Motion for Class Certification based on his failure to show that he satisfies the typicality requirement under Rule 23(a)(3).

### B. Jackson Has Failed to Establish that Certification of the Proposed Class Is Appropriate Under One of the Subdivisions of Rule 23(b)

Even where each of the four prerequisites set forth in Rule 23(a) is satisfied, the proponent of the class bears the further burden of establishing that the class is maintainable under one of the subdivisions of Rule 23(b). In this case, Jackson relies upon subdivisions (b)(1) and (b)(3). However, for the reasons set forth below, the Court concurs with Magistrate Judge Kay's conclusion that Jackson has failed to establish that certification of the proposed class is appropriate under either of these subdivisions. *See* Report and Recommendation at 16-25. This failure provides a sufficient basis for denying Jackson's Motion for Class Certification, one that exists separate and apart from Jackson's failure to satisfy the typicality requirement of Rule 23(a)(3). *See supra* Part IV.A.

1. **Certification Under Rule 23(b)(1) Is Inappropriate Because Plaintiffs' Remaining Claims Seek Individualized Monetary Relief**

Quite some time ago, the Supreme Court expressed serious doubt that claims for individualized monetary relief could be properly certified under subdivisions (b)(1) and (b)(2) of Rule 23, as opposed to subdivision (b)(3). *See Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994) (*per curiam*). Recently, those expressions of doubt became law, when the Supreme Court held in *Dukes* that "individualized monetary claims belong in Rule 23(b)(3)," *Dukes*, 131 S. Ct. at 2558, "at least where . . . the monetary relief is not incidental," *id.* at 2557.

True, the Supreme Court's decision in *Dukes* was rendered upon review of a motion for class certification under subdivision (b)(2), not subdivision (b)(1), but neither the language nor the logic of the Court's holding was so limited. First, the fundamental underpinning of the Court's holding was that "[t]he procedural protections attending the (b)(3) class—predominance, superiority, mandatory notice, and the right to opt out—are missing from [subdivision] (b)(2)," *Dukes*, 131 S. Ct. at 2558, and those procedural protections are no less absent from subdivision (b)(1). Indeed, the Supreme Court acknowledged as much, noting that "unlike (b)(1) . . . classes, the (b)(3) class is not mandatory; class members are entitled to receive 'the best notice that is practicable under the circumstances' and to withdraw from the class at their option."[16] *Dukes*, 131 S. Ct. at 2558 (citing FED. R. CIV. P. 23(c)(2)(B)). Second, the Supreme Court plainly

---

[16] Parenthetically, the Court notes that Jackson has never asked this Court to certify a class under subdivision (b)(1) while engrafting onto that subdivision the procedural protections that accompany classes certified under subdivision (b)(3), including opt-out rights. Even if he had, adopting such an approach in this case by allowing parties to opt out of the class would fundamentally undermine Jackson's proffered justifications for certification under subdivision (b)(1)—namely, that individual adjudications would create a risk of establishing "incompatible standards of conduct" or be practically "dispositive of the interests of the other members not parties to the individual adjudications." FED. R. CIV. P. 23(b)(1)(A)-(B); *see also Keepseagle v. Johanns*, 236 F.R.D. 1, 3 (D.D.C. 2006) ("[O]pt outs should not be permitted if it would undermine the policies behind (b)(1) . . . certification.") (citing *Eubanks v. Billington*, 110 F.3d 87, 94-95 (D.C. Cir. 1997)).

viewed subdivisions (b)(1) and (b)(2) to be in one category and subdivision (b)(3) to be in a category of its own, observing that unlike the "adventuresome innovation" of Rule 23(b)(3), "[c]lasses certified under (b)(1) and (b)(2) share the most traditional justifications for class treatment—that individual adjudications would be impossible or unworkable, as in a (b)(1) class, or that the relief sought must perforce affect the entire class at once, as in a (b)(2) class." *Dukes*, 131 S. Ct. at 2558 (internal quotation marks omitted; citation omitted).

Afforded a fair construction, there is every reason to believe that the Supreme Court's holding that "individualized monetary claims belong in Rule 23(b)(3)," *Dukes*, 131 S. Ct. at 2558, "at least where . . . the monetary relief is not incidental," *id.* at 2557, applies with equal force to subdivision (b)(1). Indeed, in the short time since *Dukes* was decided, the one court that has had the opportunity to address the question has reached the same conclusion. *See Altier v. Catastrophe Response, LLC*, Civil Action Nos. 11-241, 11-242, 2011 WL 3205229, at *14-15 (E.D. La. July 26, 2011) (reading *Dukes* as holding that certification under Rule 23(b)(1) is inappropriate where monetary relief predominates). Even before *Dukes*, several courts had concluded that certification under subdivision (b)(1) is inappropriate where the predominant relief sought by the class is individualized monetary damages. *See, e.g., Casa Orlando Apts., Ltd. v. Fed. Nat'l Mortg. Ass'n*, 624 F.3d 185, 197 (5th Cir. 2010); *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1195 (11th Cir. 2009); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001). The Court agrees that this is the proper approach.

The questions that remain are (a) whether Plaintiffs' extant claims seek monetary relief on behalf of the class and (b) whether such relief predominates over, or rather is merely incidental to, other forms of relief. With respect to the second question, this Court has already held that Plaintiffs' claims for declaratory and injunctive relief have been rendered moot by

virtue of the 2008 Amendment to the Act. *See Daskalea₄*, 710 F. Supp. 2d at 41-42. As a result, monetary relief is now "the sole remedy sought" by Plaintiffs in this action, *Richards*, 453 F.3d at 531 n.8, meaning that the Court need not ask whether monetary relief is the predominant form of relief or merely "incidental" to other forms of relief. *Cf. Dukes*, 131 S. Ct. at 2557 (suggesting that it is an open question whether "incidental" claims for monetary relief may be sought in (b)(2) classes). With respect to the first question, the Court concurs with Magistrate Judge Kay that class members' damages in this case will be highly individualized and are not susceptible to generalized, class-wide proof. *See* Report and Recommendation at 22 ("[T]he compensable damages sought by each plaintiff . . . will vary widely based on the value of the seized pet for breeding purposes, the alleged procedures performed by the [Humane Society], the length of the pet's detention, . . . and a host of other factors.") (internal quotation marks omitted; citation omitted). Indeed, although Jackson attempts to minimize the difference among class members' alleged damages, Jackson concedes that individualized determinations would be required to assess "[t]he value associated with special pets, such as pedigree dogs, those maintained for breeding purposes, or specially trained service animals." Pl.'s Certif. Reply at 16. Perhaps more importantly, the putative class members are alleged to have suffered a wide range of deprivations: some pets were temporarily detained, others were permanently destroyed, and still others were forcibly sterilized or returned to their owners only after requiring fees and expenses or unwanted medical treatment. *See* First Am. Compl. ¶ 71. The alleged deprivations, and by extension the resultant damages to the owner, are not consistent from case to case. In short, Plaintiffs seek individualized monetary relief. Accordingly, certification under subdivision (b)(1) is inappropriate.

### 2. Certification Under Rule 23(b)(1) Is Inappropriate Because Jackson Has Failed to Show that the Subdivision's Concerns Apply Here

Certification under Rule 23(b)(1) is appropriate where requiring the prosecution of separate actions by individual class members would run the risk of establishing "incompatible standards of conduct" for the defendants, FED. R. CIV. P. 23(b)(1)(A), or where individual adjudications would, "as a practical matter, . . . be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests," FED. R. CIV. P. 23(b)(1)(B). Conceptually, subdivisions (b)(1)(A) and (b)(1)(B) address "the same fact situation from the defendant[s'] and the class members' standpoints respectively." 2 H. NEWBERG & A. CONTE, NEWBERG ON CLASS ACTIONS § 4:3 (4th ed. 2002). In this case, Jackson has failed to establish that certification is appropriate under either subdivision (b)(1)(A) or (b)(1)(B), This provides a sufficient basis for denying certification under these subdivisions, one that exists separate and apart from the fact that Plaintiffs seek individualized monetary relief on behalf of the putative class. *See supra* Part IV.B.1.

### i. Subdivision (b)(1)(A)

Certification is appropriate under subdivision (b)(1)(A) where "prosecuting separate actions by . . . individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." FED. R. CIV. P. 23(b)(1)(A). This language is susceptible to a broad, but ultimately untenable, reading: in the absence of certification, there will always be the risk that the party opposing the class "may be exposed to individual suits and conflicting judgments on liability." 2 H. NEWBERG & A. CONTE, NEWBERG ON CLASS ACTIONS § 4:4 (4th ed. 2002). Therefore, certification under subdivision (b)(1)(A)

requires something more—namely, a legitimate risk that separate actions may establish "incompatible standards of conduct." FED. R. CIV. P. 23(b)(1)(A). This requirement is an outgrowth of the justification for certification under subdivision (b)(1)(A)—"that individual adjudications would be impossible or unworkable." *Dukes*, 131 S. Ct. at 2558.

In this case, Jackson's arguments in favor of certification under subdivision (b)(1)(A) are summary and unilluminating. In this regard, he characterizes the basic question in this action as whether Defendants afforded class members an opportunity to contest "the seizure and terms of release [of their pets]," noting that "these provisions did not exist in the defective former statute,"[17] Pl.'s Objections at 5, and contends that certification under subdivision (b)(1)(A) is appropriate because "[s]eparate actions by pet owners would create the risk of varying adjudications with respect to the Defendants' post-seizure rights and duties, and risk establishing incompatible standards of conduct for both the District and the individual [Humane Society] officers," Pl.'s Certif. Mem. at 18-19. The problem with this argument, like so many of the arguments tendered by Jackson in favor of certification, is that it ignores the fact that this Court has already dismissed Plaintiffs' facial challenge to the constitutionality of the Act as moot in light of the 2008 Amendment to the Act and the implementing regulations. *See Daskalea4*, 710 F. Supp. 2d at 41-42. As a result, Plaintiffs' claims for forward-looking declaratory and injunctive relief are no longer at issue in this action. *See id.* In other words, in light of superseding amendments to the Act, this action no longer involves delineating Defendants' responsibilities to class members—or non-parties similarly situated to class members—in the

---

[17] In passing and with no meaningful explanation, Jackson appears to suggest that the current iteration of the Act suffers from similar defects. *See* Pl.'s Certif. Reply at 12. The simple and obvious response to this suggestion is that the current iteration of the Act is not at issue in this action. In any event, despite Jackson's apparent belief to the contrary, the regulations implementing the 2008 Amendment articulate the contours of the procedures for administering and enforcing the Act. *See* D.C. MUN. REGS. tit. 24, §§ 1500-1515.

future. As it now stands, this is a case about securing monetary relief for class members based on individualized past harms. Separate actions and determinations will not create the danger of conflicting and incompatible court orders governing Defendants' conduct. Accordingly, certification under subdivision (b)(1)(A) is inappropriate.

### ii. Subdivision (b)(1)(B)

Certification under Rule 23(b)(1)(B) is appropriate where "prosecuting separate actions by . . . individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1)(B). The language of the subdivision may at first glance appear sweeping, but "courts have long recognized that [its] meaning . . . is not as broad as the plain language [might] impl[y]." *In re Tectronics Pacing Sys., Inc.*, 221 F.3d 870, 877 (6th Cir. 2000) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 842 (1999)). Indeed, the Supreme Court has counseled against the "adventurous application of Rule 23(b)(1)(B)," *Ortiz*, 527 U.S. at 845, directing courts to take into account the historical models for certification under the subdivision and warning that departures from the historical models should not be undertaken lightly, *id.* at 842.

In this regard, it is widely recognized that "[t]he traditional . . . use of subsection (b)(1)(B) class actions is in 'limited fund' cases where claims are aggregated against a res or preexisting fund insufficient to satisfy all claims." *Tectronics*, 221 F.3d at 877. Other "classical examples" include actions by shareholders to fix their rights, actions against a fiduciary to restore the subject to the trust, and suits to reorganize fraternal benefit societies. *See Ortiz*, 527 U.S. at 834. All these examples implicate either (a) a shared or collective right or (b) limited

funds or resources to be allocated among claimants, with the common thread being that "the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members." *Id.*

In this case, certifying the class proposed by Jackson would constitute a significant and inappropriate departure from these historical models. First, it is undisputed that there is no limited fund or resource that would risk being depleted were class members' claims prosecuted on an individual basis. Each class member could hypothetically bring a separate action against the District of Columbia and secure the same monetary relief sought in this action. Second, because this Court has already held that Plaintiffs' claims for declaratory and injunctive relief have been rendered moot by virtue of the 2008 Amendment to the Act, *see Daskalea4*, 710 F. Supp. 2d at 41-42, the claims that remain in this action are fundamentally retrospective, directed towards compensating class members for harms they allegedly suffered in the past. In other words, in light of superseding amendments to the Act, this action no longer involves delineating Defendants' responsibilities to class members—or non-parties similarly situated to class members—in the future. No truly shared or collective right remains at issue. Third, and perhaps most importantly, Plaintiffs' as-applied constitutional challenges to the Act—the only claims that are afforded any meaningful measure of attention in Jackson's submissions—turn on individualized determinations of liability, *see supra* Part IV.A, and they will require individualized determinations as to the damages sustained by each class member, *see supra* Part IV.B.1. Given the individualized nature of harm suffered by each class member, the only practical effect of an individual adjudication would be the possibility that any disposition might be cited for its precedential or persuasive force, which is insufficient to warrant certification

under subdivision (b)(1)(B).[18] *See Green v. Occidental Petroleum Corp.*, 514 F.2d 1335, 1340 n.10 (9th Cir. 1976) (""[T]he stare decisis consequences of an individual action . . . can[not] supply . . . the practical disposition of the rights of the class, or the substantial impairment of those rights."); *see generally* 2 H. NEWBERG & A. CONTE, NEWBERG ON CLASS ACTIONS § 4:10 (4th ed. 2002). At bottom, this is a case about securing monetary relief for class members based on individualized past harms. Under the circumstances presented, there is no reason to conclude that separate actions "would be dispositive of the interests" of non-participating class members or "substantially impair or impede their ability to protect their interests." FED. R. CIV. P. 23(b)(1)(B). As such, certification under subdivision (b)(1)(B) is inappropriate.

Notably, Jackson does not cite to a single case where certification was granted under subdivision (b)(1)(B) under similar circumstances. Instead, he claims to rely upon what he refers to as the "government entity" or "public utility" application of subdivision (b)(1)(B). *See* Pl.'s Certif. Reply at 10. However, in making this argument, Jackson appears to be laboring under the misapprehension that subdivision (b)(1)(B) may be invoked whenever the government is a named defendant. The essential thrust of his argument is as follows:

> The District of Columbia is a named defendant in this action. The [C]ourt has previously found that plaintiff's claims against the individual defendants, in their official capacities, is [sic] in effect a suit against [the] District of Columbia also. Accordingly, class certification pursuant to the government entity application of Rule 23(b)(1)(B) is appropriate.

Pl.'s Certif. Reply at 10; *see also* Pl.'s Objections at 6 (reiterating this argument verbatim). In a similar vein, he contends elsewhere that "class actions are a proper means for challenging

---

[18] Jackson does not, nor could he, argue that a judgment adverse to an individual class member in one case could be cited as grounds for invoking claim or issue preclusion in a separate action.

statutory enactments, because the defendants, as government actors, are required to treat all class members alike."[19]  Pl.'s Certif. Mem. at 19.

Quite simply, Jackson's argument is misguided.  While it is entirely non-controversial to suggest that subdivision (b)(1) may be invoked where the defendant is "obliged to treat the members of the class alike," *Amchem*, 421 U.S. at 614, that principle has no application to this case.  True, if Plaintiffs' facial challenge to the constitutionality of the Act remained viable, there would be a plausible argument that a determination as to the facial validity of the Act in one individual action would impair or impede a non-participating class member's ability to litigate that issue in a separate action.  But Plaintiffs' facial challenge has been dismissed as moot, and Plaintiffs' claims for declaratory and injunctive relief are no longer extant.  *See Daskalea4*, 710 F. Supp. 2d at 41-42.  At bottom, this action is now about compensating class members for harms they allegedly suffered in the past.  Because resolution of whether a particular class member was denied due process will turn on the fact-intensive inquiry demanded by *Mathews* and its progeny, *see supra* Part IV.A, an adjudication of one class member's claims will not substantially impair or impede another class member's ability to pursue his or her claims in a

---

[19]  Throughout his submissions, Jackson cites to the same three authorities in support of this proposition.  In the first, the one Jackson relies upon most heavily and the one that he characterizes as "dispositive," Pl.'s Certif. Mem. at 17, the United States Court of Appeals for the District of Columbia Circuit found no occasion to resolve the question whether certification was appropriate under subdivision (b)(1)(B) because the government did not challenge the merits of the certification ruling on appeal.  *United States v. Larionoff*, 533 F.2d 1167, 1181 n.36 (D.C. Cir. 1976), *aff'd*, 431 U.S. 864 (1977).  In the second, a nearly four-decade-old, non-binding opinion from this Court, the Court merely stated in formulaic fashion the required analysis under Rule 23, offering no meaningful explanation of how those principles applied to the case.  *See Guadamuz v. Ash*, 368 F. Supp. 1233, 1235 (D.D.C. 1973).  In the third, a nearly four-decade-old, non-binding opinion from the United States District Court for the Eastern District of Pennsylvania, the court merely held that certification under subdivision (b)(1)(B) was appropriate where the defendant was required to maintain a uniform set of rules and regulations governing the responsibilities of the plaintiffs.  *See Pa. Ass'n for Retarded Children v. Commonwealth of Pennsylvania*, 343 F. Supp. 272, 291-92 (E.D. Pa. 1972).

separate action. In this legal context, it is entirely unremarkable to suggest that different

outcomes may be reached on the facts presented in different cases.[20]

In the final analysis, Jackson has failed to provide a credible basis for concluding that

separate actions "would be dispositive of the interests" of non-participating class members or

"substantially impair or impede their ability to protect their interests." FED. R. CIV. P.

23(b)(1)(B). Accordingly, certification under subdivision (b)(1)(B) is inappropriate.

### 3. Jackson Has Failed to Establish that Certification Under Rule 23(b)(3) Is Appropriate

Jackson also seeks certification under Rule 23(b)(3). Certification under subdivision

(b)(3) is appropriate where "the questions of law or fact common to class members predominate

over any questions affecting only individual members, and . . . a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Ultimately, "[t]he

object is to get at the cases where a class action promises important advantages of economy of

effort and uniformity of result without undue dilution of procedural safeguards for members of

---

[20] The same holds true for Jackson's related argument that certification under (b)(1)(B) is appropriate because some of the Defendants have raised, or are expected to raise, defenses concerning qualified immunity. Pl.'s Certif. Mem. at 18. In this regard, Jackson contends that "[a] decision adverse to the Plaintiffs on . . . these governmental immunity defenses would, as a practical matter, substantially impair or impede the ability of non-parties to protect their interests." *Id.* However, because any qualified immunity defense would necessarily mirror Plaintiffs' as-applied challenges to the Defendants' administration and enforcement of the Act, any determination in this regard would be similarly individualized and thus have no discernible actual or practical effect in separate actions apart from possibly having some precedential or persuasive value, which alone is insufficient. Furthermore, the qualified immunity inquiry turns, in part, on a reasonableness inquiry that will necessarily vary from case to case, limiting the precedential and persuasive value of a decision from one case in another. *See Kalka v. Hawk*, 215 F.3d 90, 94 (D.C. Cir. 2000) ("Qualified immunity shields officials from liability for damages so long as their actions were objectively reasonable, as measured in light of the legal rules that were 'clearly established' at the time of their actions.") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818-19 (1982)). In short, despite Jackson's protestations to the contrary, there is no reason to presume that "thousands of plaintiffs [would be asked] to live with the immunity and privilege decision arrived at in the litigation of a single claimant." Pl.'s Objections at 9.

the class or for the opposing party." Benjamin Kaplan, *Continuing Work of the Civil Committee*, 81 HARV. L. REV. 356, 390 (1967). In this case, Jackson has failed to show that either the "predominance" or "superiority" criteria are satisfied.

First, the predominance inquiry "duplicates the commonality analysis in many respects," albeit "delving further into . . . the relative importance of the common issues to the case." *Barnes v. District of Columbia*, 242 F.R.D. 113, 123 (D.D.C. 2007) (citation omitted). In other words, one "requires that common questions exist"; the second "requires that they predominate." 2 H. NEWBERG & A. CONTE, NEWBERG ON CLASS ACTIONS § 4:22 (4th ed. 2002). Generally speaking, predominance will exist where issues that may be proven or disproven through "generalized evidence" on a "simultaneous, class-wide basis" overshadow issues that require examination of each class member's individualized circumstances. *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C. 2002) (internal quotation marks omitted; citation omitted). The Supreme Court has characterized the showing required for predominance as "far more demanding" that the one required to satisfy the commonality requirement under Rule 23(a). *Amchem*, 521 U.S. at 624. At bottom, the essential question is whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Id.* at 623.

In this case, the Court agrees with Magistrate Judge Kay that certification is inappropriate under subdivision (b)(3) because Jackson has failed to show that common questions predominate over individual ones. In this regard, the essential underpinning of Jackson's argument is that "[t]he procedural due process [inquiry] . . . is the same for all plaintiffs, because the statute is the same," Pl.'s Objections at 14, and he claims that "[w]hether the challenged Act deprived plaintiffs of their constitutionally protected rights – the liability issue in this case – is subject to generalized proof, because every seizure was made pursuant to the same statute." Pl.'s Certif.

39

Mem. at 20. However, as explained in depth elsewhere in this opinion, Jackson's argument is misplaced, and the Court concurs with Magistrate Judge Kay that liability determinations will necessarily be individualized and that Plaintiffs' claims are not amenable to class-wide resolution. *See supra* Part IV.A. Furthermore, despite Jackson's efforts to minimize the difference between class members, it is also clear that this action would require individual determinations as to each class member's damages.[21] *See supra* Part IV.B.1.

Second, the superiority requirement ensures that resolution by means of a class action will 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences.'" *Vista Healthplan*, 246 F.R.D. at 360 (quoting *Amchem*, 521 U.S. at 615). This Court concurs with Magistrate Judge's Kay's assessment that Jackson's "cursory" treatment of the factors relevant to establishing superiority is insufficient to demonstrate that allowing this case to proceed as a class action would be superior to other means of adjudication. Report and Recommendation at 25. Jackson's arguments are made in summary form and are unaccompanied by any meaningful factual elaboration. Pl.'s Certif. Mem. at 22-23. Again, the Court reiterates that it is Jackson's burden to establish the propriety of certification, and he has failed to discharge that burden. In any event, for all the reasons previously discussed, the Court

---

[21] The Court notes that damages will require individualized determinations in this case not because the presence of individualized damage determinations is necessarily fatal to certification under subdivision (b)(3)—district courts may, in appropriate circumstances, bifurcate liability and damage determinations or use a variety of other case management tools to minimize the adverse impact of individualized damage questions—but rather because Jackson claims that damages are "subject to generalized, class-wide proof" and contends that the question of damages actually supports certification. Pl.'s Certif. Mem. at 21-22. However, the nature of the damages inquiries in this case, if anything, counsels against certification. *See supra* Part IV.B.1.

remains unconvinced that certification would bring with it advantages of economy or uniformity of results.[22]

In sum, the Court concludes that Jackson has failed to show that either the "predominance" or "superiority" criteria are satisfied in this case. Accordingly, certification under subdivision (b)(3) is inappropriate.

### C. *Plaintiffs' Counsel Will Be Required to File a Formal Suggestion of Norris's Death with the Court*

There is one final, unrelated matter to address. During a status hearing held on June 14, 2010, Plaintiffs' counsel orally advised the Court that Norris is now deceased. *See* Order (June 14, 2011) at 1. The procedure to be followed after a party dies during the pendency of an action is prescribed by Rule 25(a)(1):

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

FED. R. CIV. P. 25(a)(1). However, "the ninety-day period under Rule 25(a)(1) is not triggered unless a formal suggestion of death is made on the record, regardless of whether the parties have knowledge of a party's death." *Lightfoot v. District of Columbia*, 629 F. Supp. 2d 16, 18 (D.D.C. 2009) (internal quotation marks omitted; citation omitted); *see also McSurely v. McClellan*, 753 F.2d 88, 98 (D.C. Cir.) ("[A] suggestion of death does not set in motion Rule 25(a)(1)'s ninety-day limitation unless the suggestion 'identif[ies] the successor . . . who may be substituted as a

---

[22] Furthermore, there is no reason to believe that the issues with certification identified by Magistrate Judge Kay and this Court could be softened by the judicious application of Rule 23(c)(4) and (5), or by any of the other case management tools available to a court in overseeing a class action. In any event, Jackson has failed to articulate any specific proposal that would allow the Court to reach that conclusion.

party.'") (quoting *Rende v. Kay*, 415 F.2d 983, 986 (D.C. Cir. 1969); notations in original), *cert. denied*, 474 U.S. 1005 (1985). Plaintiffs' counsel's oral representations in open court were not sufficient to trigger Rule 25(a)(1)'s ninety-day deadline to file a motion for substitution. Accordingly, the Court will require Plaintiffs' counsel to file a formal suggestion of death with the Court by no later than August 24, 2011. Any party wanting to file a motion for substitution will have to and including November 22, 2011 to do so. If no motion for substitution is filed by the designated date, the Court will dismiss Norris's claims from this action. In addition, the Court requests that Plaintiffs' counsel exercise his best efforts to promptly determine whether an estate was opened at the time of Norris's death or whether there is any other appropriate successor or representative who might seek to be substituted in Norris's place so that the resolution of this action is not further delayed.

## V. CONCLUSION

For the reasons set forth above, the Court concludes that Jackson has failed to establish that he satisfies the typicality requirement under Rule 23(a)(3) and that certification is appropriate under any of the subdivisions of Rule 23(b). Accordingly, the Court will overrule Jackson's Objections, adopt Magistrate Judge Kay's Report and Recommendation, and deny Jackson's Motion for Class Certification. An appropriate Order accompanies this Memorandum Opinion.

Date:    August 10, 2011

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　COLLEEN KOLLAR-KOTELLY
　　　　　　　　　　　　　　　　　　United States District Judge